1
2
3
4
5
6
7
8

**UNITED STATES DISTRICT COURT**

9

**CENTRAL DISTRICT OF CALIFORNIA**

10

11  CELECE, et al.,

| | |
|---|---|
| | Case No. CV 20-10139 GW (PVCx) |

12                     Plaintiffs,

**ORDER TO SHOW CAUSE WHY THE MAGISTRATE JUDGE SHOULD NOT RECOMMEND THAT *IN FORMA PAUPERIS* STATUS BE DENIED FOR LACK OF FEDERAL JURISDICTION**

13         v.

14  DUNN SCHOOL, et al.,

15                     Defendants.

16

17        On November 3, 2020, "Celece" and "John Doe," California residents proceeding

18  *pro se* (collectively, "Plaintiffs"), filed a joint complaint against twelve named Defendants

19  and two unknown Defendants raising twenty-six purported causes of action.

20  ("Complaint," Dkt. No. 1).  Simultaneously with the Complaint, each Plaintiff separately

21  filed a request to proceed *in forma pauperis*.  ("IFP Requests," Dkt. Nos. 5-6).  However,

22  the Complaint does not appear to provide a basis for federal jurisdiction because all of its

23  purported federal claims appear to be untimely, non-cognizable, or both.

24

25        A.    **Standard**

26

27        "A district court may deny leave to proceed *in forma pauperis* at the outset if it

28  appears from the face of the proposed complaint that the action is frivolous or without

merit," even if the plaintiff otherwise qualifies financially for IFP status. *Tripati v. First Nat. Bank & Tr.*, 821 F.2d 1368, 1370 (9th Cir. 1987); *see also* 28 U.S.C. § 1915(3)(2) ("Notwithstanding any filing fee . . . the court shall dismiss the case at any time if the court determines" that the action "(i) is frivolous or malicious; (ii) fails to state a claim on which relief may be granted; or (iii) seeks monetary relief against a defendant who is immune from such relief"). An *in forma pauperis* complaint is frivolous if "it ha[s] no arguable substance in law or fact." *Rizzo v. Dawson*, 778 F.2d 527, 529 (9th Cir. 1985); *see also Calhoun v. Stahl*, 254 F.3d 845 (9th Cir. 2001) (per curiam) ("Because [plaintiff's] complaint sought monetary relief for actions taken in the course of employment by persons who are immune from suit, the district court properly denied *in forma pauperis* status."); *Minetti v. Port of Seattle*, 152 F.3d 1113, 1115 (9th Cir. 1998) (per curiam) (district court "did not abuse its discretion by denying [plaintiff's] application to proceed *in forma pauperis* based upon the lack of merit in his complaint" where "the claims in his complaint [were] barred by res judicata, lack of standing and judicial immunity"). Nonetheless, *pro se* plaintiffs proceeding *in forma pauperis* "must also be given an opportunity to amend their complaint unless it is 'absolutely clear that the deficiencies of the complaint could not be cured by amendment.'" *Franklin v. Murphy*, 745 F.2d 1221, 1228 n.9 (9th Cir. 1984) (quoting *Stanger v. City of Santa Cruz*, 653 F.2d 1257, 1257-58 (9th Cir. 1980)); *see also Rodriguez v. Steck*, 795 F.3d 1187, 1188 (9th Cir. 2015) ("[A] district court's denial of leave to proceed *in forma pauperis* is an abuse of discretion unless the district court first provides a plaintiff leave to amend the complaint or finds that amendment would be futile."). Here, it appears that the defects in the Complaint may be fatal and amendment would be futile.

### B.   <u>Allegations of the Complaint</u>

The Complaint, which was "drafted by" Celece and is "written from [her] perspective," primarily concerns events that occurred between 1995 and 1997, when

2

Celece was fourteen to sixteen years old.  (Complaint at 5).  Celece alleges that between late February 1995 and July 1996, she was "forcibly detained" at Cross Creek Manor in LaVerkin, Utah, a "military style behavioral modification camp for girls" that subjected its residents to "NLP" programming.[1]  (*Id.* at 2-4, 7).  When insurance coverage began to run out, Celece's mother withdrew Celece from Cross Creek Manor and enrolled her at Dunn School in Los Olivos, California, a private high school where she attended tenth grade from August 1996 through early March 1997.  (*Id.* at 2-4, 10-11).

As part of the purported NPL programming at Cross Creek Manor, Celece "was subjected to enhanced interrogation, witnessed other girls as young as 12 being brutalized, and . . . was subjected to improper psychological experimentation."  (*Id.* at 8).  She was forcibly stripped naked on multiple occasions, and her life was threatened "on a near daily basis as a matter of routine."  (*Id.*).  Once, Celece's mother obtained a "home pass" for Celece and took her on a cruise, where, in accordance with NLP requirements and her mother's encouragement, she was required to flirt with older men.  (*Id.* at 10).  As the time came for Celece to leave Cross Creek Manor, she was warned that if she did not "get with the [NLP] program," she would end up dead or in jail.  (*Id.*).

Celece's mother withdrew Celece from Cross Creek Manor and took her to Dunn School in September 1996, where Celece lived in the girl's dorm.  (*Id.* at 12).  Celece was required by her mother and the NLP program to "abide by the rules of the program" even while at Dunn, which included not speaking to her male peers, but only adult males; obeying all instructions, regardless of the risk of harm, given by adult authority figures; and sitting with her legs apart, among other requirements.  (*Id.*).

---

[1] "Neuro-linguistic programming (NLP) is a pseudoscientific approach to communication, personal development, and psychotherapy created by Richard Bandler and John Grinder in California, United States, in the 1970s."  *See*  https://en.wikipedia.org/wiki/Neuro-linguistic_programming.

1    Within two weeks of Celece's arrival at Dunn, members of the faculty began
2    "bullying . . . and sexually harassing" her.  (*Id.*).  One female administrator told her that
3    she needed to become a "fluffer" in the porn industry because she could not do anything
4    but porn but was too ugly to be put in front of the camera.  (*Id.* at 13).  The school cook
5    put animal products in Celece's food, even though she was a vegan.  (*Id.*).  One teacher
6    taunted Celece by telling her that she was actually an adult male on the inside.  Teen boys
7    made lewd gestures at her and engaged in other forms of harassment, including making
8    jokes about raping her.  (*Id.* at 14-16).  One boy would walk beside Celece between
9    buildings on campus and force her to "openly engage with him in public areas," even
10   though in accordance with NPL principles she was forbidden to talk to her male peers.
11   (*Id.* at 16-17).

12

13   In October 1996, Celece met a 17-year old boy from Wisconsin on line and began
14   having phone sex with him, including when she was at her mother's home on break.  (*Id.*
15   at 17-18).  Celece's mother secretly recorded the phone calls, and ordered Celece to stop
16   talking to the boy only after the boy told Celece that he did not want to have phone sex
17   anymore, but just wanted to talk to her.  (*Id.* at 18).  During the same break, Celece's
18   mother dropped a wine bottle on Celece's toe, but refused to take her to seek medical
19   attention.  (*Id.* at 18).  When Celece saw a school nurse at Dunn after she returned from
20   break and told her about the incident, the school nurse did not call Child Protective
21   Services.  (*Id.*).  During this period, Celece's English teacher repeatedly instructed that a
22   "girl can acquire adult male support [only] if she provides sex to men," and taught the
23   class that "female prostitution is a victimless crime."  (*Id.* at 19).  Celece believed his
24   indoctrination.  (*Id.*).

25

26   Celece did not feel safe at Dunn School because she knew that her mother could
27   give permission at any time to "kidnappers" who would take her back to Cross Creek
28   Manor in the middle of the night.  (*Id.* at 21).  As a "last resort" to obtain protection,

1   Celece decided to follow her English teacher's advice and prostitute herself, even though

2   she was a virgin and wished to remain a virgin until she married.  (*Id.* at 21-22).  Celece

3   met a middle aged man through a phone sex chat line.  (*Id.* at 22).  He came to Dunn

4   School and took Plaintiff to a nearby hotel, where he gave her drugs and had sex with her.

5   (*Id.*).  In the morning, Celece asked the man to take her back with him to San Francisco,

6   but he refused, and dropped her off at her school.  (*Id.* at 23).  Before he left, Celece states

7   that they "intimately kissed" in his vehicle.  (*Id.* at 24).

8

9       The "middle aged man" in this incident appears to be Plaintiff "John Doe."  In the

10  list of parties, Celece describes John Doe as "the man I left Dunn School campus with in

11  March 1997.  At that time, he took me to a nearby motel, introduced me to drugs, and

12  engaged in sex acts with me.  He was 39 at the time and I had just turned 16."  (*Id.* at 2).

13  In the only cause of action brought by Plaintiff "John Doe," John Doe states that he was

14  "harmed by getting convicted of one count of corruption of a minor" and was "required to

15  register as a sex offender for 5 years."  (*Id.* at 46).  However, this same man is separately

16  sued by name as Defendant Darryl Devon Low, whom Celece describes as:

17

18      formerly and currently a resident of San Francisco.[2]  He is the man who

19      travelled to Dunn School in 1997 to take my virginity, a few weeks after I

20      turned 16.  He subsequently had sex with me in a motel room at the time.

21      He was investigated, charged and convicted for one count of corruption of a

22      minor pertaining to what he did to me.

23

24  (*Id.* at 3).  Accordingly, "John Doe" appears to be both a Plaintiff and a Defendant in this

25  action, and will be identified as "John Doe/Low" where appropriate.[3]

26  _____

27  [2] Plaintiff "John Doe" states in his IFP application that the application was executed in
    San Francisco.  (Dkt. No. 6 at 2).

28  [3] Additionally, John Doe's IFP application, at the top left caption, below John Doe's name
    lists the following email address:  darryldeelow@... (Dkt. No. 6 at 1).

After this incident, Celece told a school official that she had previously been sexually abused, apparently before she went to Cross Creek Manor. (*Id.* at 24). When Celece's mother was informed of the abuse, she decided to return Celece to Cross Creek Manor. (*Id.* at 24-25). Other faculty and staff at Dunn learned of the abuse and reasoned that that was why Celece "cooperated with [her] sexual assault" by John Doe/Low, even though they should have taken responsibility for their own influence in guiding Celece to prostitution. (*Id.* at 25). Celece told the Dunn School director that if she were sent back to Cross Creek Manor, she would be killed, but still he did not call Child Protective Services. (*Id.* at 26).

Celece's mother hired two "adults to extrajudiciously arrest" Celece and take her back to Cross Creek Manor. (*Id.* at 27). While she was there during this second stay, she was verbally abused by her therapist and staff, one of whom described her as "every pedophile's dream." (*Id.* at 28). Celece was also physically attacked and placed in solitary confinement. (*Id.*). In protest, Celece went on a ten-day hunger strike. (*Id.* at 29). On the tenth day, a physician was called to pronounce Celece's time of death, but she "miraculously stood up and walked out unassisted." (*Id.*). Celece was taken to a detox hospital, where intake staff called Child Protective Services and removed her from the custody of her mother and Cross Creek Manor. (*Id.*).

## C.    Plaintiffs' Claims

Plaintiffs collectively raise numerous claims, all but one of which are brought by Celece, which may be grouped as follows:

1.     **Claims Based on the March 1997 Sexual Encounter with John Doe/Low, and the Events that Induced Celece to Seek John Doe/Low's Protection through Sex**

Celece alleges claims against Dunn School and the Dunn School Trust for sex discrimination under 20 U.S.C. § 1681 on the ground that Dunn School employees induced her to engage in prostitution and cooperate with "Low's sexual victimization" of her. (Claim 1, Complaint at 30). She sues the former director of Cross Creek Manor, Ron Garrett, and her English teach at Dunn School, David "Tom" Challinor, for "gross negligence" based on Challinor's promotion of prostitution and Garrett's terrorization of her at Cross Creek Manor, which prompted Celece to have sex with John Doe/Low in an effort to obtain protection and escape having to return to Cross Creek Manor. (Claim 2, *id.* at 31). She sues Dunn School and Dunn School Trust for violation of California Penal Code § 261.5, unlawful sexual intercourse with person under eighteen. (Claim 10, *id.* at 41). She sues Dunn School for sex discrimination under 42 U.S.C. § 2000. (Claim 18, *id.* at 50). She sues the perpetrator of the act, Darryl Devon Low, by name for intentional infliction of emotional distress. (Claim 22, *id.* at 54-55).

2.     **Failure to Report**

Celece sues the CEO and head of Dunn School, Mike Beck, and Barbara Zasloff, her Dunn School adviser/guidance counselor, for violation of California Penal Code § 11166, for failure to report suspected child abuse. (Claim 3, *id.* at 33 (Beck); Claim 4, *id.* at 34 (Zasloff)). She also sues Beck for "gross negligence" under the same theory. (Claim 25, *id.* at 60). She sues Dunn School for failure to report medical neglect. (Claim 13, *id.* at 45). She also sues her mother, Ceta Dochterman, for "obstruction of justice" under 42 U.S.C. § 1985 for failing to notify her of John Doe/Low's sentencing hearing. (Claim 24, *id.* at 57).

7

### 3.    Kidnapping/False Imprisonment

Celece sues her mother and two unknown Defendants for conspiring to kidnap her in March 1997 and return her to Cross Creek Manor, in violation of 18 U.S.C. § 1201. (Claim 5, *id.* at 34).  She sues Cross Creek Manor and her mother jointly for false imprisonment based on her first and second stays at the facility.  (Claim 6, *id.* at 35; Claim 11, *id.* at 42).  She also sues Cross Creek Manor and her mother for "deprivation of [her] right to habeas corpus."  (Claim 12, *id.* at 43).

### 4.    Emotional Distress

Celece sues numerous Defendants for intentional infliction of emotional distress. (Claims 7, 19 & 20, *id.* at 36, 51-52 (Garrett, the director of Cross Creek Manor); Claim 8, *id.* at 36 (Celece's mother); and Claims 23 & 26, *id.* at 55-56, 60 (Cross Creek Manor)). Celece also sues Garrett for "improper human experimentation" under 42 U.S.C. § 1983. (Claim 21, *id.* at 53).

In the only claim that is not brought by Celece, John Doe/Low sues Garrett and Challinor (Celece's high school English teacher at Dunn School) for negligent infliction of emotion distress on the ground that these two Defendants "created the opportunity for [John Doe/Low] to have sex with a female minor by convincing [Celece] that [she] needed to provide [herself] to adult men for sex in order to be safe."  (Claim 14, *id.* at 46).

### 5.    The NLP Program

Celece sues the creators of the NLP program, David and Jeanie Gilcrease, for gross negligence.  (Claim 9, *id.* at 37).  She sues the same two Defendants for intentional infliction of emotional distress.  (Claim 15, *id.* at 46 (Jeanie Gilcrease); Claim 16, *id.* at 47

(David Gilcrease)).  She sues John Grinder and Richard Bandler, the co-creators of the NLP "product," for "product liability."  (Claim 17, *id.* at 48).

### 6.    Prayers for Relief

Celece seeks compensatory and punitive damages and a declaration that it was an apparent "miracle . . . when [her] health was fully restored on the 10th day of [her] food-and-water strike" because her "state of health at that time cannot be fully explained by current medical knowledge."  (*Id.* at 61).  In the alternative, Celece asks that the ownership of Dunn School and its operating trust be transferred to her.  (*Id.*).

### D.    <u>The Complaint Does Not Appear to State a Viable Claim Providing Federal Jurisdiction</u>

"Federal courts are courts of limited jurisdiction.  They possess only that power authorized by Constitution and statute."  *Kokkonen v. Guardian Life Ins. Co. of America*, 511 U.S. 375, 377 (1994).  "A federal court is presumed to lack jurisdiction in a particular case unless the contrary affirmatively appears."  *Stock West, Inc. v. Confederated Tribes*, 873 F.2d 1221, 1225 (9th Cir.1989).  The burden to establish federal jurisdiction "rests upon the party asserting jurisdiction."  *Kokkonen*, 511 U.S. at 377.  Statutes conferring jurisdiction on federal courts must be strictly construed.  *See Duncan v. Stuetzle*, 76 F.3d 1480, 1485 (9th Cir. 1996).

The issue of subject matter jurisdiction may be raised *sua sponte* by the Court at any time during the course of the proceedings.  *Snell v. Cleveland, Inc.*, 316 F.3d 822, 826 (9th Cir. 2002).  Pursuant to Rule 12(h)(3) of the Federal Rules of Civil Procedure, the Court must dismiss an action if the Court lacks subject matter jurisdiction.

There are two statutory bases for federal subject matter jurisdiction:  federal question jurisdiction under 28 U.S.C. § 1331 and diversity jurisdiction under 28 U.S.C. § 1332.  For federal question jurisdiction, § 1331 provides that "[t]he district courts shall have original jurisdiction of all civil actions arising under the Constitution, laws, or treaties of the United States."  "The presence or absence of federal-question jurisdiction is governed by the 'well-pleaded complaint rule,' which provides that federal jurisdiction exists only when a federal question is presented on the face of the plaintiff's properly pleaded complaint."  *Caterpillar, Inc. v. Williams*, 482 U.S. 386, 482 (1987).  For diversity jurisdiction, § 1332(a) provides in relevant part that "[t]he district courts shall have original jurisdiction of all civil actions where the amount in controversy exceeds the sum or value of $75,000 . . . and is between (1) citizens of different States."  Generally, there must be complete diversity of citizenship among all the adverse parties for diversity jurisdiction to lie.  28 U.S.C. § 1332(a); *Caterpillar, Inc. v. Lewis*, 519 U.S. 61, 68 (1996) ("complete diversity of citizenship" requires that "the citizenship of each plaintiff [must be] diverse from the citizenship of each defendant").

Plaintiffs summarily assert that "[t]he parties to this complaint are diverse." (Complaint at 2).  However, the Complaint on its face reveals that there is not complete diversity among the parties because both Plaintiffs and at least some of the Defendants appear to be citizens of California.  (*Id.*) (stating that eight parties "lived and worked in California," four parties "lived and worked in Utah," and three parties "lived and worked in the United States").  Accordingly, it does not appear that the Court has diversity jurisdiction over this matter.

Nor does the Complaint appear to assert any viable federal question claims.  Many of the federal statutes invoked do not apply to the facts of this case, and even if they did, all of the events at issue in the Complaint occurred at least twenty-three years ago.

10

Therefore, even if a claim might otherwise be cognizable, it appears that all of the claims are barred by the relevant statute of limitations.

The Complaint states that federal jurisdiction is appropriate under § 1331 because this "case raises federal questions in actions 1, 5, 12, 18, 21, and 25.[4]  It raises constitutional questions in actions 6 and 11." (Complaint at 2).  However, none of these claims appears viable, and as such, they do not appear to provide any basis for federal jurisdiction in this case.

**Claim 1:  20 U.S.C. § 1681 (sex discrimination)**.  Claim 1 alleges that Dunn School and the Dunn School Trust are liable under 20 U.S.C. § 1681 (Title IX) for sex discrimination.  (Complaint at 30).  As the Supreme Court has explained, "Title IX prohibits sex discrimination by recipients of federal education funding.  The statute provides that '[n]o person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance.'" *Jackson v. Birmingham Bd. of Educ.*, 544 U.S. 167, 173 (2005) (quoting 20 U.S.C. § 1681(a)). Although the Complaint does not specifically allege that Dunn School receives federal funding, even assuming, without deciding, that it does and that Celece has standing to assert a Title IX claim, this claim appears grossly untimely.  Pursuant to the Ninth Circuit, because Title IX "does not expressly provide any statute of limitations," a court will borrow the state law statute of limitations for personal injury actions.  *Stanley v. Trustees of California State Univ.*, 433 F.3d 1129, 1134 (9th Cir. 2006).

---

[4] Claim 25 is a state law claim for gross negligence brought against Dunn School's CEO and head, Mike Beck.  (Complaint at 59).  It is likely that Plaintiffs intended to refer to Claim 24, which is ostensibly a claim for obstruction of justice under 42 U.S.C. § 1985 brought against Celece's mother.  (*Id.* at 57).

1    As of January 1, 2003, the statute of limitations for personal injury actions in

2 California is two years. *Canatella v. Van De Kamp*, 486 F.3d 1128, 1132 (9th Cir. 2007)

3 (citing Cal. Code Civ. Proc. § 335.1).  However, prior to that date, the statute of

4 limitations was one year. *Maldonado v. Harris*, 370 F.3d 945, 955 (9th Cir. 2004).

5 Because the statute extending the statute of limitations for personal injury actions from

6 one year to two years "does not apply retroactively, any cause of action that was more

7 than one-year old as of January 1, 2003 would be barred under the previous one-year

8 statute of limitations." *Canatella*, 486 F.3d  at 1132-33; *see also Maldonado*, 370 F.3d at

9 955 ("In enacting the new two-year statute of limitations, the California Legislature made

10 it applicable retroactively only to the victims of the terrorist attacks of September 11,

11 2001.").

12

13    Accordingly, Celece's Title IX claim in Claim 1 appears to be subject to

14 California's then-operative one-year statute of limitations for personal injury actions.

15 Because Celece's cause of action accrued in March 1997, the claim would normally have

16 expired one year later, in March 1998.  However, because Celece was under the age of

17 majority at the time her claim accrued, the statute of limitations would appear to be tolled

18 until she turned eighteen years old.[5]   Even if the statute of limitations did not begin to run

19 until February 1999, when Celece turned eighteen, the one-year statute of limitations

20 would have expired in February 2000.  Because the instant Complaint was not filed until

21 November 3, 2020, Claim 1 would still appear to be untimely by over twenty years.

22 Accordingly, Claim 1 does not appear to provide a basis for federal question jurisdiction.

23

24 _____

[5]  Under California law, the statute of limitations may be tolled in certain circumstances
25 where an action accrues when the plaintiff is under the age of legal capacity to make
decisions until the plaintiff reaches her majority. *See* Cal. Civ. Proc. Code § 352.  Where
26 a federal statute borrows a state statute of limitations, a federal court will also apply to
state's "'tolling rules where not inconsistent with federal law.'" *Azer v. Connell*, 306 F.3d
27 930, 936 (9th Cir. 2002) (quoting *Morales v. City of Los Angeles*, 214 F.3d 1151, 1155)).
According to the Complaint, Celece was born in February 1981 and would therefore have
28 turned eighteen years old in February 1999, at which time, assuming that § 352 applies,
the statute of limitations would have begun to run.  (Complaint at 2).

**Claim 5:  18 U.S.C. § 1201 (kidnapping)**.  In Claim 5, Celece alleges that her mother and two unknown Defendants are liable for kidnapping under 18 U.S.C. § 1201. (Complaint at 34).  Section 1201(a) states in relevant part that "[w]hoever unlawfully seizes, confines, inveigles, decoys, kidnaps, abducts, or carries away and holds for ransom or reward or otherwise any person . . . shall be punished by imprisonment for any term of years or for life and, if the death of any person results, shall be punished by death or life imprisonment."  However, Claim 5 fails to state a viable claim for relief because § 1201 is a criminal statute that does not give rise to a private cause of action.  *See Monroe v. McNairy Cnty., Tenn.*, 850 F. Supp. 2d 848, 876 (W.D. Tenn. 2012) ("[T]he Federal Kidnapping Act is a criminal statute, and there is no indication that Congress intended to create a private right of action for violations of its provisions."); *Giano v. Martino*, 673 F. Supp. 92, 95 (E.D. N.Y. 1987) ("[T]he Federal Kidnapping Act was never intended to confer rights on the victim of a kidnapping, and does not do so by its language."); *Myrland v. Gillmor*, 2018 WL 2090476, at *2 (D. Haw. May 4, 2018) (dismissing claim under § 1201 without leave to amend because "the criminal statutes Plaintiff relies upon do not support civil liability");  *Belval v. Walgreen's*, 2017 WL 6063063, at *2 (D. Nev. Dec. 7, 2017), report and recommendation adopted, 2018 WL 456028 (D. Nev. Jan. 16, 2018) ("Section 1201, by its own terms, does not create a private cause of action and '[c]ivil causes of action . . . do not generally lie under the criminal statutes contained in [Title 18].'  Therefore, 'federal kidnapping' and 'federal imprisonment' do not form the basis of federal question jurisdiction.") (internal citation omitted).  Accordingly, Celece's § 1201 claim in Claim 5 does not appear to support federal question jurisdiction.

**Claims 6 and 11:  14th Amendment (unlawful incarceration)**.  In Claim 6, Celece claims that Cross Creek Manor and her mother "incarcerated" her without legal procedure, and as such, violated her "right to due process as guaranteed in the 14th Amendment."  (Complaint at 36).  Claim 11, brought against the same two Defendants for the same reasons, appears to be merely a restatement of Claim 6.  (*Id.* at 42-43).

13

1    Constitutional torts arise under 42 U.S.C. § 1983.  Claims 6 and 11 fail because § 1983

2    also borrows the state law statute of limitations for personal injury actions.  Cross Creek

3    Manor is in Utah.  However, even with the more generous four-year statute of limitations

4    for personal injury actions under Utah law, it appears that Celece's Fourteenth

5    Amendment claims would still be grossly untimely.  *See Carpinteria Valley Farms, Ltd. v.*

6    *Cnty. of Santa Barbara*, 344 F.3d 822, 828 (9th Cir. 2003) ("The applicable statute of

7    limitations for actions brought pursuant to 42 U.S.C. § 1983 is the forum state's statute of

8    limitations for personal injury actions."); *Dansie v. Anderson Lumber Co.*, 878 P.2d 1155,

9    1159 (Utah Ct. App. 1994) ("The statute of limitations governing [plaintiff's] claim

10    allowed four years in which to bring her personal injury action[.]") (citing Utah Code

11    Ann. § 78-12-25(3)); *Colosimo v. Roman Catholic Bishop of Salt Lake City*, 104 P.3d 646,

12    652 (Utah Ct. App. 2004) ("Causes of action that accrue during minority . . . are tolled

13    until the plaintiff reaches the age of eighteen.") (citing Utah Code Ann. § 78-12-36).

14

15        The constitutional claims in Claims 6 and 11 also appear to fail for the additional

16    reason that Cross Creek Manor and Celece's mother are not "state actors."  To state a

17    claim under section 1983, a plaintiff must allege that the deprivation of a right secured by

18    the federal constitution or statutory law was committed by a person acting under color of

19    state law.  *Anderson v. Warner*, 451 F.3d 1063, 1067 (9th Cir. 2006).  "While generally

20    not applicable to private parties, a § 1983 action can lie against a private party when he is

21    a willful participant in joint action with the State or its agents."  *Kirtley v. Rainey*, 326

22    F.3d 1088, 1092 (9th Cir. 2003).

23

24        The Ninth Circuit has identified four circumstances under which a private person

25    may be said to be acting under color of state law.  Under the "public function" test, "when

26    private individuals or groups are endowed by the State with powers or functions

27    governmental in nature, they become agencies or instrumentalities of the State and subject

28    to its constitutional limitations."  *Id.* at 1093 (quoting *Lee v. Katz*, 276 F.3d 550, 554–55

1    (9th Cir. 2002)).  Under the joint action test, a court will consider whether "the state has
2    so far insinuated itself into a position of interdependence with the private entity that it
3    must be recognized as a joint participant in the challenged activity" and "knowingly
4    accepts the benefits derived from unconstitutional behavior."  *Kirtley*, 326 F.3d at 1093
5    (quoting  *Parks Sch. of Bus., Inc. v. Symington*, 51 F.3d 1480, 1486 (9th Cir. 1995)).
6    Under the "governmental coercion or compulsion" test, the court considers "whether the
7    coercive influence or 'significant encouragement' of the state effectively converts a
8    private action into a government action."  *Kirtley*, 326 F.3d at 1094 (quoting *Sutton v.*
9    *Providence St. Joseph Medical Center*, 192 F.3d 826, 836-37 (9th Cir. 1999)).  Finally,
10   under the "government nexus" test, the court asks whether "there is such a close nexus
11   between the State and the challenged action that the seemingly private behavior may be
12   fairly treated as that of the State itself."  *Kirtley*, 326 F.3d at 1095 (quoting *Brentwood*
13   *Academy v. Tennessee Secondary School Athletic Ass'n*, 531 U.S. 288, 295 (2001)).

14

15       Neither Cross Creek Manor nor Celece's mother appears to have been acting on
16   behalf of a state or local government.  Accordingly, even if the claims in Claims 6 and 11
17   were not grossly untimely, they appear to fail on the alternate ground that the wrongs
18   alleged were not committed by government actors.  Accordingly, Claims 6 and 11 do not
19   appear to provide a basis for federal question jurisdiction.

20

21       **Claim 12:  28 U.S.C. § 2248 (habeas corpus)**.  In Claim 12, Celece alleges that
22   Cross Creek Manor and her mother deprived her of her "right to habeas corpus" under 28
23   U.S.C. § 2248.  (Complaint at 43).  The reference to § 2248 appears to be an error because
24   that statute merely provides that "[t]he allegations of a return to the writ of habeas corpus
25   or of an answer to an order to show cause in a habeas corpus proceeding, if not traversed,
26   shall be accepted as true except to the extent that the judge finds from the evidence that
27   they are not true."  However, even assuming that Celece is attempting to petition for a writ
28   of habeas corpus under 28 U.S.C. § 2254, the claim fails.

1   　　Pursuant to 28 U.S.C. §2254(a), a federal court "shall entertain an application for

2   writ of habeas corpus in behalf of a person in custody pursuant to the Judgment of a State

3   Court only on the ground that he is *in custody* in violation of the Constitution or laws or

4   treaties of the United States." *Id.* (emphasis added).  Thus, "[f]or a federal court to have

5   jurisdiction over a habeas petition filed by a state prisoner, the petitioner must be 'in

6   custody.'" *Zichko v. Idaho*, 247 F.3d 1015, 1019 (9th Cir. 2001).  Specifically, a habeas

7   petitioner must "be 'in custody' under the conviction or sentence under attack at the time

8   his petition is filed." *Maleng v. Cook*, 490 U.S. 488, 490 (1989).  The "in custody"

9   requirement is jurisdictional, and "therefore it is the first question [the Court] must

10  consider." *Bailey v. Hill*, 599 F.3d 976, 978 (9th Cir. 2010) (internal quotation marks

11  omitted).

12

13  　　Celece's habeas claim in Claim 12 fails because she is not currently in custody and

14  in fact never was in custody pursuant to a state court conviction.  Accordingly, Claim 12

15  does not appear to provide a basis for federal question jurisdiction.

16

17  　　**Claim 18:  42 U.S.C. § 2000 (sex discrimination)**.  In Claim 18, Celece alleges

18  that the harassment she endured at Dunn School "disrupted [her] ability to learn" and

19  rendered her "unable to fully participate in the educational process."  (Complaint at 51).

20  Because the harassment was "specific to her sex," Celece claims it "violated 42 U.S.C.

21  § 2000."  (Complaint at 50-51).  "The Civil Rights Act of 1964 (codified at 42 U.S.C.

22  § 2000 *et seq.*) creates a civil rights cause of action in specific contexts: voting rights

23  (Title I); places of public accommodation (Title II); Public Education (Title IV); Federally

24  Assisted Programs (Title VI); and Employment (Title VII)." *Liggon-Redding v. PP+L*,

25  2006 WL 8459489, at *2 (E.D. Pa. Jan. 30, 2006).  As one court explained,

26

27  　　[The Civil Rights Act of 1964] includes nine titles, which prohibit race and

28  　　status-based discrimination in various contexts.  Title I bars the unequal

1    application of voter registration requirements; Title II bans discrimination in
2    hotels, restaurants and other public accommodations; Title III prohibits
3    discriminatory access to public facilities; Title IV relates to school
4    desegregation; Title V expands the Civil Rights Commission; Title VI
5    prohibits discrimination in federally assisted programs; Title VII prohibits
6    discrimination in employment; Title VIII requires compilation of voter data;
7    Title IX makes civil rights cases reviewable in federal courts and authorizes
8    the Attorney General to intervene; Title X establishes the Community
9    Relations Service for the purpose of assisting local claims of discrimination;
10   and Title XI provides the right to a jury trial for persons accused of
11   contempt of the Act.

12

13   *Jones v. Nat'l Council on Disability*, 66 F. Supp. 3d 94, 100 (D. D.C. 2014), aff'd, 2015

14   WL 653308 (D.C. Cir. Feb. 5, 2015) (footnote omitted); *see also Chisholm v. United of*

15   *Omaha Life Ins. Co.*, 514 F. Supp. 2d 318, 321 n.2 (D. Conn. 2007).

16

17          The exact Title of the Civil Rights Act that Celece intends to invoke in Claim 18 is

18   unclear.  However, her claim of harassment at Dunn School does not appear to state a

19   claim under Title IV, 42 U.S.C. § 2000c, because Dunn School is a private, not a public,

20   school.  "Title IV primarily addresses desegregation in public schools and is applicable

21   only to public schools.  42 U.S.C. § 2000c, *et seq*.  Title IV is not applicable in the context

22   of a private school." *Melton v. Alaska Career Coll., Inc.*, 2016 WL 1312738, at *2 (D.

23   Alaska Apr. 4, 2016), aff'd, 738 F. App'x 895 (9th Cir. 2018).  Similarly, Claim 18 does

24   not appear to state a claim under Title VI, 42 U.S.C. § 2000d, because it is unclear

25   whether Dunn School receives federal funds.  However, even if Celece could state a claim

26   against Dunn School under Title VI, the claim would still be barred as untimely.  Title VI

27   claims under 42 U.S.C. § 2000d borrow the state statute of limitations for personal injury

28   actions.  *Taylor v. Regents of Univ. of California*, 993 F.2d 710, 712 (9th Cir. 1993).

Under California's then-applicable one-year statute of limitations, any Title VI claim filed after 1998 against Dunn School would be untimely.  Accordingly, no matter how Claim 18 is construed, it does not appear to provide a basis for federal question jurisdiction.

**Claim 21:  42 U.S.C. § 1983 ("improper human experimentation")**.  In Claim 21, Celece alleges that the director of Cross Creek Manor "violated 42 U.S.C. § 1983" because he kept her in solitary confinement, with the overhead light on 24 hours a day; prohibited any form of human communication or auditory stimulation such as music; required her to sit in one place and stare at the wall without looking around; and essentially subjected her to "a form of sensory deprivation."  (Complaint at 54).  While unclear, it appears that Celece's invocation of § 1983 may be an attempt to allege a Fourteenth Amendment claim.  Like the Complaint's other Fourteenth Amendment claims, this claim appears to fail because it is grossly untimely even under Utah's four-year statute of limitations for personal injury actions, and because Cross Creek Manor is not a government-run institution.  Accordingly, Claim 21 does not appear to provide a basis for federal question jurisdiction.

**Claim 24:  42 U.S.C. § 1985 (obstruction of justice)**.  In Claim 24, Celece alleges that her mother "obstructed justice" in violation of 42 U.S.C. § 1985 because she did not inform her of John Doe/Low's sentencing hearing in California in late 1997, and thus deprived her of the opportunity to "write a victim impact statement."  (Complaint at 58).

Section 1985 "is derived from the thirteenth amendment and covers all deprivations of equal protection of the laws and equal privileges and immunities under the laws, regardless of its source."  *Gillespie v. Civiletti*, 629 F.2d 637, 641 (9th Cir. 1980).  Paragraph 1985(1) prohibits conspiracies to prevent a government officer by "force, threat or intimidation" from discharging his duties; Paragraph 1985(2) prohibits conspiracies to prevent "any party or witness" by "force, threat or intimidation" from attending or

testifying in court.  Paragraph 1985(3) prohibits conspiracies "for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws."  42 U.S.C. § 1985(3).  To recover under § 1985(3), a plaintiff must demonstrate "(1) a conspiracy, (2) to deprive any person or a class of persons of the equal protection of the laws, or of equal privileges and immunities under the laws, (3) an act by one of the conspirators in furtherance of the conspiracy, and (4) a personal injury, property damage or a deprivation of any right or privilege of a citizen of the United States."  *Gillespie*, 629 F.2d at 641 (citing *Griffin v. Breckenridge*, 403 U.S. 88, 102-03 (1971)).

Celece's § 1985 claim in Claim 24 appears to fail both substantively and because it is untimely.  State personal injury statutes provide the statute of limitations for § 1985 claims.  *See McDougal v. Cnty. of Imperial*, 942 F.2d 668, 674 (9th Cir. 1991).  Whether considered under the then-applicable one-year statute of limitations under California law or the more generous four-year statute of limitations under Utah law, Claim 24 is grossly untimely.  Furthermore, Celece does not allege any facts showing that her mother withheld information because Cecele was a member of a disfavored group or that her mother engaged in a conspiracy with other persons to deprive her of that information *for the purpose of* depriving her of her equal protection rights.  Accordingly, Claim 24 does not appear to provide a basis for federal question jurisdiction.

For the reasons stated above, none of the purported federal claims in the Complaint appears to state a viable, cognizable cause of action.  Accordingly, Plaintiffs are **ORDERED TO SHOW CAUSE** why the Magistrate Judge should not recommend that *in forma pauperis* status be denied for lack of federal jurisdiction.  In their response, Plaintiffs must identify any factual or legal errors in the Court's analysis of the claims, and should explain why, if the substantive defects in the Complaint's federal claims can be overcome, the applicable statutes of limitations should be tolled or excused.  The deadline for filing a response to this Order to Show Cause is **twenty-one days** from the date of the order.  **Plaintiffs are expressly cautioned that the failure to file a timely response to this Order to Show Cause will result in a recommendation that *in forma pauperis* status be denied and this action be dismissed without prejudice for lack of federal jurisdiction.**

IT IS SO ORDERED.

DATED:  November 19, 2020

_____
PEDRO V. CASTILLO
UNITED STATES MAGISTRATE JUDGE